# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

————

Argued December 8, 2022          Decided March 5, 2024

No. 21-7135

JOHN DOE 1, INDIVIDUALLY AND ON BEHALF OF PROPOSED
CLASS MEMBERS, ET AL.,
APPELLANTS

v.

APPLE INC., ET AL.,
APPELLEES

————

Appeal from the United States District Court
for the District of Columbia
(No. 1:19-cv-03737)

————

*Terrence P. Collingsworth* argued the cause and filed the briefs for appellants.

*William J. Aceves* and *Catherine Sweetser* were on the brief for *amici curiae* International Legal Scholars in support of appellants.

*Martina E. Vandenberg* and *Agnieszka M. Fryszman* were on the brief for *amici curiae* Legal Scholars with Expertise in Extraterritoriality and Transnational Litigation in support of appellants.

2

*Paul Hoffman* was on the brief for *amicus curiae* Human Trafficking Institute in support of appellants.

*Eric A. Shumsky* argued the cause for appellees. With him on the brief were *Beth S. Brinkmann*, *David M. Zionts*, *Henry Ben-Heng Liu*, *John A. Boeglin*, *Emily Johnson Henn*, *Lauren A. Weber*, *Craig A. Hoover*, *Neal Kumar Katyal*, *David M. Foster*, *Danielle Desaulniers Stempel*, *Sean P. Gates*, *Andrew C. Nichols*, and *Carolyn Frantz*. *Theodore J. Boutrous, Jr.* and *Jacob T. Spencer* entered appearances.

*Paul Lettow*, *John B. Bellinger, III*, *John P. Elwood*, and *Sean A. Mirski* were on the brief for *amici curiae* The Chamber of Commerce of the United States of America, et al. in support of appellees.

Before: SRINIVASAN, *Chief Judge*, PILLARD and RAO, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* RAO.

RAO, *Circuit Judge*: Cobalt is an essential metal for producing the lithium-ion batteries that power modern electronics. Nearly two-thirds of the world's cobalt comes from the Democratic Republic of the Congo ("DRC"), where some of the metal can be traced to informal mining by Congolese nationals digging with primitive tools in unsafe conditions. Many of these informal miners are children, pressured into work by extreme poverty.

This lawsuit seeks to impose liability on five American technology companies for "forced labor" used for informal cobalt mining in the DRC. The plaintiffs, former cobalt miners injured in mining accidents and their representatives, sued the companies under the Trafficking Victims Protection

3

Reauthorization Act of 2008 ("TVPRA"). That statute makes it unlawful to "participat[e] in a venture" that engages in forced labor. The plaintiffs allege the technology companies participated in a venture with their cobalt suppliers by purchasing the metal through the global supply chain. The district court dismissed the suit for a variety of reasons, including lack of Article III standing and failure to state a claim.

Although we conclude that the plaintiffs have standing to pursue their damages claims, they have failed to state a claim for relief. Purchasing an unspecified amount of cobalt through the global supply chain is not "participation in a venture" within the meaning of the TVPRA. We therefore affirm the district court's dismissal of the complaint under Rule 12(b)(6).

## I.

The TVPRA creates a civil remedy against any person who "knowingly benefits … from participation in a venture" that violates federal slavery and human trafficking laws. Pub. L. No. 110-457, § 221, 122 Stat. 5044, 5067 (codified at 18 U.S.C. § 1595(a)). Among other things, those laws make it illegal to obtain the labor of a person by force or to engage in the trafficking of any such person. 18 U.S.C. §§ 1589–90.

This lawsuit alleges Apple, Alphabet, Dell Technologies, Microsoft, and Tesla (the "Tech Companies") violated the TVPRA by participating in the global cobalt supply chain—a "venture" that depends on forced labor.

## A.

To understand the alleged TVPRA "venture," we first trace the path of cobalt through the global supply chain. We recount the facts as presented in the complaint, accepting them

4

as true for the purposes of the motion to dismiss. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Cobalt is a metal used to make rechargeable lithium-ion batteries, which are essential components of the smartphones, laptops, electric cars, and other electronic devices manufactured by the Tech Companies. According to the plaintiffs, the Tech Companies purchase cobalt from large international suppliers; those suppliers' subsidiaries exploit and perpetuate informal mining in the DRC; and informal mining involves forced labor.

The Tech Companies buy cobalt from at least three foreign firms: Glencore, Zhejiang Huayou Cobalt Company ("Huayou"), and Eurasian Resources Group. Each of these suppliers obtains cobalt from one or more subsidiaries in the DRC. For example, Glencore controls the Kamoto Copper Company ("KCC"). KCC provides cobalt to Glencore, which sells it to Umicore, N.V. Umicore then refines the cobalt and sells it to Apple, Alphabet, and Microsoft, as well as to intermediaries that in turn sell to Dell and Tesla. Similarly, Huayou runs Congo Dongfang Mining ("CDM"), which supplies processed cobalt that Huayou sells to Apple, Dell, and Microsoft. And Eurasian Resources owns a mine called Metalkol SA, from which it sells cobalt to Tesla.

The large cobalt suppliers and their subsidiaries have mechanized and industrial operations in the DRC, but some cobalt is still mined informally by Congolese nationals in open pits and crude tunnels. The work is dangerous—mine collapses are common, and miners are frequently maimed or killed. Locals are allegedly "forced" into informal mining "by hunger and desperation."

Informally mined cobalt enters the supply chain through a variety of channels. The subsidiaries of Glencore, Huayou,

5

and Eurasian Resources mingle cobalt obtained by forced labor with other sources of the metal. For instance, KCC allows Congolese Presidential Guards to access one of its mining sites and recruit children to dig up cobalt, which the Guards then sell to buying houses; agents of CDM buy bags of "cobalt-rich rocks" at the DRC-Zambian border to ship back to Huayou in China; and at Eurasian Resources's Metalkol mine, middlemen force informal miners to work in the tunnels and gather bags of cobalt.

As alleged in the complaint, the participants in the cobalt market intentionally use a murky supply chain to obscure the extent to which they rely on forced labor. This allows the Tech Companies and their suppliers to avoid formal association with forced labor, yet everyone in the venture knows the global supply chain includes cobalt procured by forced labor. And the cobalt suppliers and their subsidiaries actively solicit and force children to work in order to meet the Tech Companies' growing demand for cobalt.

## B.

The plaintiffs are four former miners, seven legal representatives of former miners who are still children, and five representatives of child miners who were killed in cobalt mining operations.

James Doe 1's story is typical of the group. He dropped out of school after the second grade and started working as a surface digger, picking ore off the ground and selling what he found. He later joined an informal group of miners and began digging tunnels in an old copper-cobalt mine. He died at age seventeen in a mining tunnel collapse. Another plaintiff, John Doe 1, quit school at age nine to be a surface digger. At age fifteen, he began work as a mule for KCC, carrying heavy bags of rocks up and down a mountain for ten to fifteen cents per

6

trip. During one trip, he fell nearly twenty feet into a tunnel, an accident that broke his back and left him paralyzed. The other miners were similarly recruited as children to engage in dangerous mining operations and suffered tunnel collapses, falls, and other accidents that left them paralyzed, disfigured, or worse. The stories of the sixteen miners paint a dismal picture of exploitation and unsafe working conditions in the DRC's small-scale cobalt mines.

The plaintiffs claim that a variety of factors forced the children into these jobs. The children lacked the funds to afford school, so they began mining at a young age to avoid starvation and to support their families. Once they started, the miners felt pressured into continuing the work. Several plaintiffs insist they were trapped in a "debt bondage situation" where "sponsors" gave out food and funds as an advance but deducted the amount of the advance, along with other costs, from the plaintiffs' earnings when the cobalt was sold. Other miners were told that if they did not continue working in the mines, they would be blacklisted and barred from working at any other mines in the region.

The forced labor was organized or overseen by agents or subsidiaries of the Tech Companies' cobalt suppliers. Many of the plaintiffs worked for a Lebanese labor broker named Ismail, who recruited children into gangs of miners. Ismail was authorized to organize these miners by a DRC-based company controlled by Glencore. Similarly, another labor broker arranged for children to work at mines owned by subsidiaries of Huayou and to sell the cobalt to Chinese middlemen. Each miner in the case was injured or killed at a mine operated by a subsidiary of Glencore, Huayou, or Eurasian Resources. Because these companies supply cobalt to the Tech Companies, the plaintiffs claim their forced labor was

7

connected to and furthered by the Tech Companies' participation in the global cobalt market.

## C.

Based on these allegations, the plaintiffs sued the Tech Companies, claiming the global cobalt supply chain was a TVPRA "venture" and the Tech Companies participated in that venture with the full knowledge that cobalt suppliers and their subsidiary mining companies employed and trafficked in forced labor. The plaintiffs also brought common law claims for unjust enrichment, negligent supervision, and intentional infliction of emotional distress based on the same supposed "venture." They sought to represent a class of similarly situated child miners in the DRC, and they requested damages, injunctive relief, and other equitable remedies.

The Tech Companies moved to dismiss for lack of subject matter jurisdiction and for failure to state a claim. The district court granted all motions in favor of the Tech Companies.[1] It held in the alternative that: (1) the plaintiffs lacked standing; (2) the plaintiffs had not adequately alleged the Tech Companies "participated in a venture"; (3) the plaintiffs had not adequately alleged forced labor or trafficking in forced labor under 18 U.S.C. §§ 1589 and 1590; and (4) 18 U.S.C. § 1595 does not apply extraterritorially. The plaintiffs appealed.

## II.

Article III vests the judiciary with the power "to resolve not questions and issues but 'Cases' or 'Controversies.'" *Ariz.*

---

[1] The district court also granted Dell's motion to dismiss for lack of personal jurisdiction, which the plaintiffs do not appeal.

8

*Christian Sch. Tuition Org. v. Winn*, 563 U.S. 125, 132 (2011) (quoting U.S. CONST. art. III, § 2). The constitutional requirement "that a case embody a genuine, live dispute between adverse parties … prevent[s] the federal courts from issuing advisory opinions." *Carney v. Adams*, 141 S. Ct. 493, 498 (2020). To ensure we stay within the judicial power, we ask at the threshold whether a plaintiff has standing to sue. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 88–89 (1998).

We assess standing with reference to three elements. First, the plaintiffs "must have suffered an injury in fact." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (cleaned up). Second, the injury must be "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Id.* (cleaned up). Third, the injury must be redressable by a favorable decision of the court. *Id.* at 561. Where, as here, the plaintiffs seek damages and equitable relief, they must separately demonstrate standing "for each claim … and for each form of relief that is sought." *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017) (cleaned up).

The plaintiffs have established injury and causation for both their damages claims and claims for injunctive relief. While damages will redress the plaintiffs' injuries, it is purely speculative whether an injunction against the Tech Companies would provide any redress. We therefore find standing only for the damages claims.

A.

At the outset, the plaintiffs have alleged an injury in fact resulting from the forced labor. The plaintiffs include miners who suffered serious physical injuries, as well as the representatives of those who were injured or killed while mining in the DRC. Physical injuries are "tangible" harms that

9

are "concrete and particularized." *See TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203–04 (2021); *Pub. Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.*, 489 F.3d 1279, 1292 (D.C. Cir. 2007) ("[P]hysical injuries … are plainly concrete harms under the Supreme Court's precedents."). The plaintiffs have thus satisfied the first element of Article III standing for both damages and injunctive relief.

B.

The parties dispute whether the plaintiffs have demonstrated their injuries are "fairly traceable" to the actions of the Tech Companies. Traceability or "'causation' in [the Article III] context is something of a term of art, taking into account not merely an estimate of effects but also considerations related to the constitutional separation of powers" and "the proper role of courts in the American governmental structure." *Haitian Refugee Ctr. v. Gracey*, 809 F.2d 794, 801 (D.C. Cir. 1987). "Article III grants federal courts the power to redress harms that defendants cause plaintiffs, not a freewheeling power to hold defendants accountable for legal infractions." *TransUnion*, 141 S. Ct. at 2205 (cleaned up).

To be fairly traceable, there must be a "causal connection between the assertedly unlawful conduct and the alleged injury." *Allen v. Wright*, 468 U.S. 737, 753 n.19 (1984). The chain of causation may not be "attenuated," *id.* at 752, nor can it "result[] from the independent action of some third party not before the court," *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 42 (1976). The Supreme Court has recognized, however, that "Congress has the power to … articulate chains of causation that will give rise to a case or controversy where none existed before." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540,

10

1549 (2016) (quoting *Lujan*, 504 U.S. at 580 (Kennedy, J., concurring in part and concurring in the judgment)).

The plaintiffs allege the TVPRA establishes the necessary causal link because Congress has imposed liability on anyone who knowingly benefits from "participation in a venture" that uses forced labor. 18 U.S.C. § 1595(a). Because the Tech Companies allegedly participate in a venture with the cobalt suppliers whose subsidiaries are responsible for the forced labor, the plaintiffs maintain the Tech Companies are within the statutory causal chain for liability.

The parties dispute what constitutes "participation in a venture" within the meaning of the TVPRA. But whether the Tech Companies were in fact participating in a venture is not part of the threshold jurisdictional inquiry; it is a question for the merits, which we address below. *See infra* Part III. "[T]he absence of a valid (as opposed to arguable) cause of action does not implicate subject-matter jurisdiction." *Steel Co.*, 523 U.S. at 89. When assessing standing at the pleading stage, we assume that the plaintiffs' view of the statute is correct and that they will be successful on the merits of their claim. *Attias v. CareFirst, Inc.*, 865 F.3d 620, 629 (D.C. Cir. 2017). For the following reasons, we conclude the plaintiffs' allegations are sufficient to establish traceability under the TVPRA.

1.

The TVPRA explicitly establishes civil liability for perpetrators of forced labor and indirect liability for other knowing participants. The Act extends to a person who "knowingly benefits … by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of [federal slavery and trafficking laws]," including the prohibition on forced labor. 18 U.S.C. § 1595(a); *see also id.* § 1589. In the

11

TVPRA, "Congress created … [a] private right of action, allowing plaintiffs to sue defendants who are involved *indirectly* with slavery." *Nestlé USA, Inc. v. Doe*, 141 S. Ct. 1931, 1939 (2021) (emphasis added); *see also id.* at 1940 (noting "distinctions … in the TVPRA … between direct and indirect liability"). The plaintiffs rely on this statutory chain of causation to support their standing.

Even though Congress has spoken, we must consider whether the TVPRA's indirect liability for participation in a venture establishes a causal chain that satisfies Article III. "Congress's creation of a statutory prohibition or obligation and a cause of action does not relieve courts of their responsibility to independently decide whether a plaintiff has" Article III standing. *TransUnion*, 141 S. Ct. at 2205.

With respect to the injury in fact and redressability requirements, the Court has looked to "both history and the judgment of Congress." *Spokeo*, 136 S. Ct. at 1549. Because the case or controversy requirement is "grounded in historical practice, it is instructive to consider whether" a claimed injury "has a close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts. In addition, … [Congress's] judgment is also instructive and important." *Id.* (cleaned up). Following *Spokeo*, the Court assessed whether a statutory injury satisfied Article III by considering "whether plaintiffs have identified a close historical or common-law analogue for their asserted injury." *TransUnion*, 141 S. Ct. at 2204. Similarly, in *Uzuegbunam v. Preczewski*, history and common law were central to assessing whether nominal damages satisfied Article III redressability. 141 S. Ct. 792, 797–98 (2021); *see also id.* at 805 (Roberts, C.J., dissenting) ("We should of course consult founding-era decisions when discerning the boundaries of our jurisdiction, for the Framers sought to limit the judicial power to 'Cases'

12

and 'Controversies,' as those terms were understood at the time.").

The Supreme Court has not explicitly addressed whether or how the reasoning of *Spokeo* and *TransUnion* applies to the fair traceability analysis when Congress has established a statutory chain of causation. These decisions, however, rest on the longstanding principle that Article III provides a constitutional minimum that cannot be lowered by Congress. And the Court has recognized it is at least *sufficient* to establish Article III standing if a statutory injury has a close common law or historical analogue. In *TransUnion*, for instance, the Court had "no trouble concluding" that the plaintiffs who "suffered a harm with a 'close relationship' to the harm associated with the tort of defamation … suffered a concrete harm that qualifies as an injury in fact." 141 S. Ct. at 2209; *see also Uzuegbunam*, 141 S. Ct. at 798 (explaining that because "nominal damages historically could provide prospective relief," they satisfy the Article III redressability requirement).

Assuming without deciding that the inquiry set forth in *Spokeo* and *TransUnion* applies to the fairly traceable requirement of standing, the TVPRA's indirect liability for "participation in a venture" satisfies the constitutional minimum because it mirrors the aiding and abetting liability long established at common law. Traditional aiding and abetting liability has three elements: "(1) the party whom the defendant aids must perform a wrongful act that causes an injury; (2) the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance; [and] (3) the defendant must knowingly and substantially assist the principal violation." *Halberstam v. Welch*, 705 F.2d 472, 477 (D.C. Cir. 1983). The third element emphasizes the "assistance" to the tortfeasor,

13

which may be as simple as "advice or encouragement." *Id.* at 478 (cleaned up).

The TVPRA is similar. It applies to anyone who "knowingly benefits … from participation in a venture" that involves, among other things, forced labor. 18 U.S.C. § 1595(a). Like aiding and abetting liability, the TVPRA requires (1) a wrongful act that causes an injury, specifically forced labor; (2) knowledge, as the defendant must knowingly benefit; and (3) substantial assistance, namely participation in the "venture." The language of venture mirrors the "assistance" required for aiding and abetting liability. Indeed, under the common law, such liability attaches to "a joint venturer." *Halberstam*, 705 F.2d at 474. Thus, in the TVPRA, Congress created a causal link for venture liability that is a "close … analogue" to common law aiding and abetting. *TransUnion*, 141 S. Ct. at 2204.

To the extent that liability under the TVPRA may range somewhat beyond the contours of traditional aiding and abetting, Congress maintains some leeway when creating statutory causes of action. An "exact duplicate in American history and tradition" is unnecessary, and courts "must afford due respect to Congress's decision to impose a statutory prohibition or obligation on a defendant." *Id.* The TVPRA's causal chain for a "venture" has a "close relationship" to lawsuits that would be cognizable in the English and American courts. *Spokeo*, 136 S. Ct. at 1549. Congress's decision to establish such liability in the TVPRA is therefore consistent with Article III.

We conclude the plaintiffs have demonstrated causation because they have alleged the Tech Companies are in a "venture"—as the plaintiffs understand the TVPRA—with Glencore, Huayou, Eurasian Resources, and their DRC

14

subsidiaries who are responsible for the forced labor. This analysis applies equally to the claim for damages and injunctive relief because the statute identifies the necessary causal link between the plaintiffs' injuries and the Tech Companies' actions.

2.

The Tech Companies' arguments to the contrary are unavailing. Relying on the district court's traceability analysis, the Tech Companies insist the plaintiffs' causal chain is speculative and "flows through the independent actions of multiple third parties." Because forced labor in the DRC depends on a network of local actors, the Companies maintain they are "disconnected from the wrongdoers" and, as "end-purchasers of a fungible metal," they cannot be held "responsible for the conditions" at the bottom of the global supply chain.

These arguments, however, blur the line between standing and the merits. When evaluating "causation" for the purposes of standing, we are not determining whether the Tech Companies are *responsible* for the forced labor and physical injuries of the miners in the sense of ultimate liability. The law knows many types of causation, and Congress has latitude to establish liability based on different causation requirements. Article III does not constitutionalize a particular theory of tort causation. *See, e.g.*, *Maine Lobstermen's Ass'n v. Nat'l Marine Fisheries Serv.*, 70 F.4th 582, 593 (D.C. Cir. 2023) ("Article III standing does not follow the causation principles of tort law."); *Tozzi v. U.S. Dep't of Health & Human Servs.*, 271 F.3d 301, 308 (D.C. Cir. 2001) ("[W]e have never applied a 'tort' standard of causation to the question of traceability."). At the standing threshold, an injury need only be "fairly traceable" to the actions of a defendant. *Lujan*, 504 U.S. at 560 (cleaned up).

15

And here, the plaintiffs plausibly allege they are victims of forced labor in part because of the Tech Companies' demand for cobalt and their business relationship with the offending cobalt suppliers, and we assume for standing purposes that this suffices for venture liability under the TVPRA.

The Tech Companies in essence respond that, even if forced labor in the DRC is in some loose sense traceable to the Companies' involvement in the supply chain, the TVPRA's indirect liability for participation in a venture falls below the "fair traceability" floor of Article III standing. But as already explained, in the TVPRA Congress recognized a causal link between the injury of forced labor and actors who indirectly facilitate it. And that legislative judgment accords with longstanding common law liability for aiders and abettors. Indirect venture liability loosens the causal chain, but there is still a "fairly traceable" link between miners and the Tech Companies sufficient for Article III standing.

C.

We next turn to redressability, which requires showing that the "injury … caused by the defendant [is] redressable by a court order." *United States v. Texas*, 143 S. Ct. 1964, 1970 (2023). While the plaintiffs have established redressability for monetary damages, they have not done so for injunctive relief.

1.

Redressability is straightforward for the plaintiffs' damages claims, and the Tech Companies do not contest it. The Supreme Court has recognized that suffering can be relieved, to some extent, by compensation. "Compensatory damages are intended to redress the concrete loss that the plaintiff has suffered by reason of the defendant's wrongful conduct." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 416

16

(2003) (cleaned up); *see also* RESTATEMENT (SECOND) OF TORTS § 901 cmt. a (Am. Law Inst. 1979) (explaining that "when the plaintiff has been harmed in body or mind, money damages are no equivalent but are given to compensate the plaintiff for the pain or distress"). A damages award redresses a past injury and can make an appreciable difference in the plaintiff's position. *See Los Angeles v. Lyons*, 461 U.S. 95, 109 (1983); *Attias*, 865 F.3d at 629 (holding plaintiffs who suffered past financial injury "*can* satisfy the redressability requirement" because they can be "made whole by monetary damages"). Thus, the plaintiffs have established standing for their damages claims.

2.

We next consider whether the plaintiffs have demonstrated redressability for injunctive relief. The complaint does not specify what type of injunction the plaintiffs seek, but before the district court they requested an order prohibiting "the cobalt venture from using forced child labor." The parties have not addressed whether injunctions are available in private suits under the TVPRA. *Compare* 18 U.S.C. § 1595(a) (authorizing private plaintiffs to "recover damages" but not speaking to injunctive relief), *with id.* § 1595A(a) (authorizing injunctive relief in civil actions brought by the Attorney General). But even assuming an injunction is available, the plaintiffs have failed to establish standing to seek one because enjoining the Tech Companies would not redress the miners' injuries.

To meet the Article III minimum, the miners must demonstrate it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan*, 504 U.S. at 561 (cleaned up). "[U]nadorned speculation will not suffice to invoke the federal judicial power." *Simon*, 426 U.S. at 44. Moreover, standing to seek an injunction is difficult

17

to establish when the effectiveness of relief depends on the compliance of third parties not before the court. *See Haaland v. Brackeen*, 143 S. Ct. 1609, 1638–39 (2023).

The plaintiffs insist they have standing to seek injunctive relief because the Tech Companies are in a "venture" with the cobalt suppliers, and therefore the Tech Companies have sufficient influence "to stop the cobalt venture from using forced child labor." But the plaintiffs have failed to demonstrate that an injunction would redress their injuries. First, while the plaintiffs' request for injunctive relief is entirely forward looking, they do not explicitly allege that any of them are still miners. In fact, the complaint refers to them as "former" child cobalt miners. The mere existence of past injury, however, does not justify forward looking equitable relief. *Lyons*, 461 U.S. at 105–07; *see also Dearth v. Holder*, 641 F.3d 499, 501 (D.C. Cir. 2011) ("[W]here the plaintiffs seek … injunctive relief, past injuries alone are insufficient to establish standing."). Because there are no allegations the plaintiffs are still victims of forced labor, an injunction seeking to end forced labor in the DRC would not appreciably affect these plaintiffs' position.[2]

For several of the plaintiffs, the complaint does not specify whether they might be able to continue mining despite their

---

[2] The plaintiffs hope to represent a class of "*current* and former child workers." But at the pleading stage, "[t]hat a suit may be a class action adds nothing to the question of standing, for even named plaintiffs who represent a class must allege and show that they personally" have Article III standing. *Spokeo*, 136 S. Ct. at 1547 n.6 (cleaned up); *see also J.D. v. Azar*, 925 F.3d 1291, 1324 (D.C. Cir. 2019) ("[A]n absent class member's individual standing will not suffice [to establish standing].").

18

injuries.[3] But even assuming that one or more miners could benefit from forward looking relief, it is "entirely speculative" whether an injunction running against the Tech Companies would thwart forced child mining in the DRC. *Allen*, 468 U.S. at 758. The plaintiffs suggest that the Tech Companies have substantial market power and could simply insist the cobalt suppliers stop using forced labor. But the plaintiffs allege no facts suggesting that the Tech Companies have control over informal mining operations and forced labor violations far down the supply chain. The Tech Companies are five end-purchasers of cobalt and not the only ones. "[A]ll other tech and electric car companies in the world" require cobalt, according to the plaintiffs. Because the complaint lacks any allegations about what percentage of cobalt the Tech Companies purchase from Glencore, Huayou, and Eurasian Resources, it is impossible to say whether the cobalt suppliers' subsidiaries will change their labor practices at the behest of five clients or whether they will continue operations and sell their cobalt to other buyers.

Furthermore, as the plaintiffs recognize, many actors in addition to the cobalt suppliers perpetuate labor trafficking, including labor brokers, other consumers of cobalt, and even the DRC government. Issuing an injunction to the Tech Companies to "stop the cobalt venture from using forced child labor" would not bind the direct perpetrators of the unlawful labor, who are not before this court. *See Lujan*, 504 U.S. at 571 (plurality opinion) (concluding there was no redressability where the relevant harms were caused by independent third parties and it was "entirely conjectural" whether an injunction against the defendant would change their behavior); *cf.*

---

[3] Plaintiff John Doe 7, for example, was allegedly shot through the armpit and "can no longer lift with his left arm," but his capacity to mine in the future is unclear.

19

*Brackeen*, 143 S. Ct. at 1638–39 (holding that plaintiffs lacked standing to seek an injunction when the entities responsible for the alleged illegality were not parties to the lawsuit).

It is therefore "entirely speculative" whether the insistence of the five Tech Companies to stop using forced labor would end the use of forced labor by the cobalt suppliers, their subsidiaries, and affiliates. *See Allen*, 468 U.S. at 758. Because the plaintiffs have failed to show that an injunction against the Tech Companies would appreciably redress their injuries, injunctive relief would be largely hortatory and outside the proper role of Article III.

III.

Because the plaintiffs have standing for their damages claims, we proceed to the merits. We review de novo the district court's dismissal of the complaint under Rule 12(b)(6), accepting the pleaded facts as true and drawing all reasonable inferences in the plaintiffs' favor. *Ofisi v. BNP Paribas, S.A.*, 77 F.4th 667, 671 (D.C. Cir. 2023). We affirm the district court's dismissal because the plaintiffs have failed to plausibly allege "participation in a venture."[4]

The plaintiffs claim the Tech Companies violated the TVPRA by "knowingly benefit[ting] … from participation in a venture" involving forced labor. 18 U.S.C. § 1595(a). The plaintiffs do not allege the Tech Companies directly violated federal forced labor prohibitions. Nor do the plaintiffs allege the Tech Companies directly controlled the mines where the

---

[4] Because we affirm on this ground, we do not address the district court's alternative holdings—which the Tech Companies defend on appeal—(1) that the plaintiffs failed to adequately plead forced labor or labor trafficking under sections 1589 and 1590, and (2) that the TVPRA does not apply extraterritorially.

20

plaintiffs' injuries occurred. Instead, the plaintiffs contend the Tech Companies conducted business with companies who facilitated forced labor. The plaintiffs also maintain the Tech Companies, as major purchasers of cobalt, had sufficient market power to dictate the conditions at the mines.

The TVPRA does not define the terms "participation" or "venture" for purposes of section 1595(a). Therefore, we begin with the ordinary meaning of both terms. *Asgrow Seed Co. v. Winterboer*, 513 U.S. 179, 187 (1995). A "venture" is an "undertaking that is dangerous, daring, or of uncertain outcome," or a "business enterprise involving some risk in expectation of gain." *Venture*, THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (4th ed. 2000); *see also Venture*, BLACK'S LAW DICTIONARY (8th ed. 2004) (an "undertaking that involves risk," especially—but not exclusively—"a speculative commercial enterprise"). "Participation" means "taking part or sharing in something." *Participation*, AMERICAN HERITAGE DICTIONARY, *supra*. Together these definitions suggest an ordinary meaning of "participation in a venture": taking part or sharing in an enterprise or undertaking that involves danger, uncertainty, or risk, and potential gain.[5]

The plaintiffs have not adequately alleged the Tech Companies participated in a venture because there is no shared

---

[5] Instead of dictionary definitions, the plaintiffs argue we should rely on a different section of federal trafficking law, which defines "venture" as "any group of two or more individuals associated in fact." 18 U.S.C. § 1591(e)(6). But that definition applies only to sex trafficking. *Id.* § 1591(e) (stating the ensuing definitions apply "[i]n this section"). "[A]lthough we usually presume that Congress intends phrases in the same statute to mean the same thing, the text of this statute overcomes that presumption." *Doe v. Red Roof Inns, Inc.*, 21 F.4th 714, 724 (11th Cir. 2021) (citation omitted).

21

enterprise between the Companies and the suppliers who facilitate forced labor. The Tech Companies own no interest in their suppliers. Nor do the Tech Companies share in the suppliers' profits and risks. Although a formal business relationship is not necessary to be a participant in a venture, something more than engaging in an ordinary buyer-seller transaction is required to establish "participation" in an unlawful venture. The two groups here, by contrast, are on opposite sides of an arms-length transaction: Glencore, Huayou, and Eurasian Resources sell cobalt, and the Tech Companies buy cobalt.

The allegations here differ markedly from other cases finding participation in a venture under the TVPRA. For example, in *Ricchio v. McLean*, the defendant motel operators rented a room to a man who repeatedly physically and sexually abused a young woman as he "groom[ed] her for service as a prostitute subject to his control." 853 F.3d 553, 555 (1st Cir. 2017). The motel operators took actions beyond an arms-length exchange with the abuser. They had a history of working with the trafficker and, even after the "coercive and abusive treatment of [the woman] as a sex slave had become apparent," the motel operators facilitated the operation and even "demand[ed] further payment." *Id.* In other words, they acknowledged the illegal purpose of the relationship, shared in the benefits and the risk, and controlled the premises on which the scheme took place.[6]

The Seventh Circuit also recently found a plausible TVPRA violation based on close cooperation between business

---

[6] By contrast, in *Doe v. Red Roof Inns*, the Eleventh Circuit held that plaintiffs failed to plausibly allege hotel franchisors participated in an unlawful venture with their franchisees' employees because the franchisors did not take part in the "common undertaking of sex trafficking." 21 F.4th at 727.

22

entities. *See G.G. v. Salesforce.com, Inc.*, 76 F.4th 544, 560 (7th Cir. 2023). The court held a plaintiff may plausibly allege participation in a venture by showing a "continuous business relationship" and "a desire to promote the wrongful venture's success." *Id.* at 559–60 (cleaned up). But the alleged "business relationship" was more than just a purchasing agreement. The defendant Salesforce provided direct support, specific business advice, and productivity enhancing software to Backpage.com, which hosted prostitution ads, thereby "facilitat[ing] the growth of … a business … whose business model was built upon systematic and widespread violations of [federal sex trafficking law]." *Id.* at 560–61.

By contrast, the plaintiffs here have not alleged a factual basis to infer a common purpose, shared profits and risk, or control as in *Ricchio*, nor do they allege the Tech Companies and the cobalt suppliers had the type of direct and continuous relationship that existed between the parties in *Salesforce*. The plaintiffs repeatedly stress that the Tech Companies had a "tacit agreement" to regularly "obtain [their] cobalt" from suppliers whose subsidiary mining companies employed forced labor. The purported agreement, however, was merely to buy and sell cobalt. And purchasing a commodity, without more, is not "participation in a venture" with the seller.

The plaintiffs also maintain that the Tech Companies are different from ordinary buyers because they "have a contractual right to inspect and … control" the cobalt suppliers. As evidence of a supposed right to inspect, the plaintiffs allege Apple performed a "third party audit" of Huayou after public pressure about the use of forced labor. But a third-party investigation is not evidence of a contractual right to inspect, let alone evidence of control. Additionally, the plaintiffs claim the Tech Companies "required" Glencore and Huayou to join the Fair Cobalt Alliance, an "industry-led program in which the

23

companies monitor themselves." And several of the companies collaborated to fund a "model mining project" to demonstrate progress the mines were making to be child labor free. But these programs do not establish a joint venture either. The Tech Companies may exhort their cobalt suppliers to employ humane practices, and companies can mutually pledge to follow better labor standards, but neither circumstance gives buyers control over their suppliers or results in the sharing of risks and rewards.

Finally, the plaintiffs suggest that the possibility of commercial pressure is enough to establish a "venture" between a buyer and seller. They contend that, because the Tech Companies constitute the "essential market" for cobalt, the Companies could force changes in mining practices. The only control apparent in the complaint, however, is the Tech Companies' right to stop purchasing cobalt. Even if we assume that allegations of market power could show participation in a venture, the plaintiffs' allegations do not suffice to support this theory. The plaintiffs allege only that the Tech Companies "and *other members of the venture* now control at least 80-85 percent of the DRC cobalt supply chain." The purported "venture" at least includes the Tech Companies, Glencore, Umicore, Huayou, and Eurasian Resources, but it might include more firms, and the relative power of each participant is never specified. Moreover, the plaintiffs offer no facts to suggest how much of the suppliers' cobalt was purchased by the Tech Companies as opposed to other members of the venture or other global buyers. Without more specific allegations, the question is whether the Tech Companies' purchasing an *unspecified* amount of cobalt from a supply chain originating in DRC mines plausibly demonstrates "participation in a venture" with anyone engaged in forced labor in that supply chain. We hold that it does not.

24

IV.

With respect to their common law claims for unjust enrichment, negligent supervision, and intentional infliction of emotional distress, the plaintiffs' only merits argument on appeal is that, because the Tech Companies were in a venture with the cobalt suppliers, a co-venturer would be sufficiently connected to the acts to be jointly and severally liable for the common law tort claims. As we agree with the district court that the Tech Companies failed to allege participation in a venture, we affirm dismissal of the common law claims as well.

\* \* \*

The plaintiffs have standing for their damages claims, but not their claims for injunctive relief. Because the plaintiffs failed to state a claim under the TVPRA or the common law, however, we affirm the district court's dismissal on these grounds.

*So ordered.*